# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 16-1292V**
**(to be published)**

```
* * * * * * * * * * * * * * * * * * * * * * * * *
JAMES E. BLACK,                    *
                                   *        Special Master Oler
                                   *
              Petitioner,          *        Filed: June 28, 2019
                                   *
       v.                          *        Attorneys' Fees and Costs;
                                   *        Reasonable Basis
                                   *
SECRETARY OF HEALTH AND            *
HUMAN SERVICES,                    *
                                   *
              Respondent.          *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

*Ramon Rodriguez, III*, Sands Anderson, PC, Richmond, VA, for Petitioner.

*Sarah Christina Duncan*, U.S. Department of Justice, Washington, D.C., for Respondent.

### DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

On October 7, 2016, James E. Black ("Petitioner") filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program"),[2] alleging that he developed significant systemic allergy symptoms and an egg allergy as a result of the seasonal

---

[1] This Decision will be posted on the Court of Federal Claims' website. **This means the ruling will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). If, upon review, I agree that the identified materials fit within this definition, I will redact such material from public access. Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

influenza ("flu") vaccination administered on October 11, 2013.[3]  Petition ("Pet."), ECF No. 1. On May 7, 2018, Petitioner filed a Motion for a Decision Dismissing Petition (ECF No. 35); a decision dismissing the petition for insufficient proof was issued on May 8, 2018. ECF No. 36. Judgment was entered on June 8, 2018. ECF No. 38.

On December 5, 2018, Petitioner filed this Motion for Attorneys' Fees and Costs.[4]  Fees Application ("Fees App."), ECF No. 41.  Petitioner requests attorneys' fees for the work performed by Rawls Law Group ("RLG") in the amount of $18,491.30, and costs in the amount of $5,131.35, totaling **$23,622.65**. *Id.*  Petitioner also requests attorneys' fees for the work performed by Sands Anderson, PC ("SA") in the amount of $8,717.30, and costs in the amount of $61.14, totaling **$8,778.44**.  Petitioner's counsel asserts that Petitioner incurred costs of **$6.62**. *Id.*  Respondent opposes the motion and contends that Petitioner failed to establish a reasonable basis for his claim. Respondent's Response ("Resp't's Resp."), ECF No. 42.  On December 26, 2018, Petitioner filed a reply.  Petitioner's Reply ("Pet'r's Reply"), ECF No. 43.  For the reasons set forth herein, Petitioner's Motion for Attorneys' Fees and Costs is **GRANTED IN PART**.

## I.    Factual History

Petitioner was born on August 1, 1956 and was fifty-seven years old at the time he received the flu vaccine on October 11, 2013. Petitioner's Exhibit ("Ex.") 7 at 1.  His past medical history includes hypertension, transient ischemic attacks ("TIA"), atrial septal defect, deep vein thrombosis, chronic pancreatitis, GERD, appendectomy, patent foramen ovale closure, and cholecystectomy. Ex. 3 at 1-3, 6, 140; Ex. 5 at 57.

On October 15, 2013, Petitioner presented to the emergency department ("ED") of Huntsville Hospital ("HH") complaining of weakness to the left side, slurred speech, and facial drooping that began eighteen hours earlier. Ex. 3 at 315.  His exam did not note any skin issues. *Id.* at 317, 322.  He was diagnosed with acute CVA (cerebrovascular accident) and was discharged against medical advice. *Id.* at 338, 340.

On October 23, 2013, Petitioner was seen at HH Neurological Associates to establish care with a neurologist for recurrent TIAs. Ex. 6 at 29-31.  Later that day, Petitioner presented to the Center for Colon and Digestive Disease for chronic abdominal pain[5]. Ex. 5 at 147.  Rash was not noted at either visit.

---

[3] This case was initially assigned to now-retired Special Master Hastings (ECF No. 4), reassigned to Special Master Corcoran on October 4, 2017 (ECF No. 26), and then reassigned to my docket on December 6, 2017 (ECF No. 28).

[4] Petitioner filed the attachments to her Motion for Fees Application as Exhibits 15-26.  For clarification, I will refer to Petitioner's motion as "Fees App." and cite to the page numbers of Petitioner's motion in accordance with the appropriate Exhibit number and the generated pagination.

[5] The record shows that Petitioner was seen monthly by a GI specialist, Dr. Allen Goetsch, at the Center for Colon and Digestive Disease for chronic abdominal pain beginning December 2007. His first visit post-vaccination was on October 23, 2013.

On October 25, 2013, Petitioner returned to HH ED complaining of left leg pain. An ultrasound revealed peroneal thrombosis. Ex. 3 at 349-52. On October 31, 2013, Petitioner returned to the ED for a TIA. *Id.* at 358. That same day, Petitioner was seen for a follow-up visit regarding his thrombosis. Ex. 6 at 16-17. On November 11, 2013, Petitioner was seen by his primary care physician, Dr. Hodges, to discuss his medications. Ex. 12 at 1. On November 20, 2014, Petitioner was seen by his GI specialist Dr. Goetsch for his monthly pain check-up appointment. Ex. 5 at 149-50. These visits did not reference a rash or skin abnormality.

On December 4, 2013 within two months of vaccination, Petitioner presented to Dr. Hodges complaining of painful "welts" with itching and stated that he "th[ought] this may be a reaction to Xarelto." Accordingly, Dr. Hodges recorded that Petitioner "appears to have generalized welts that tend to come and go" and diagnosed Petitioner with an "allergic reaction presumably from Xarelto." Ex. 12 at 2.

Dr. Goetsch further recorded skin itching and rash at Petitioner's monthly GI appointments on January 15 and April 2, 2014. Ex. 5 at 153, 158. There were no indications of itching or rash at the December 18, 2013 or February 26, 2014 appointments with Dr. Goetsch. *Id*. at 151, 156.

Petitioner returned to Dr. Hodges on March 12, 2014 with a two-day history of "welts and swelling primarily affecting his lips and eyes." Ex. 12 at 3. The history noted Petitioner had been on several rounds of steroids, which provided temporary relief for "about two weeks" until symptoms returned. It was noted that the reaction started at the top of his feet, and that he had developed "some places like bruises about his arms." *Id*. Dr. Hodges noted that Petitioner had a history of past reactions to Plavix and Xarelto and diagnosed Petitioner with "Allergic Dermatitis [of] questionable etiology." *Id.* Dr. Hodges made a referral to an allergist, Dr. Ravipati. *Id.*

Petitioner saw Dr. Mahipal Ravipati at the Decatur Allergy Clinic on March 17, 2014. Petitioner complained of a rash over his whole body and reported a six-month history of breaking out in rashes. Ex. 9 at 1. Petitioner reported that the rash would first appear on his feet and would gradually spread to the rest of his body. Some of the episodes included swelling of the lips and face. The rash was reported as itchy, but not consistently, with "no specific triggering factors and no other systemic symptoms." *Id.* The physical exam indicated "annular plaques and urticarial lesions all over the body." *Id.* at 5. Dr. Ravipati assessed the Petitioner with pityriasis rosea, nummular eczema, and urticaria. *Id.* Dr. Ravipati performed a biopsy and prescribed Atarax and Temovate. *Id.* at 6.

On April 18, 2014 Petitioner returned to Dr. Ravipati's office to discuss biopsy results, which showed superficial perivascular dermatitis. Ex. 9 at 11, 41. Petitioner indicated at this visit that "the symptoms are worse" and "the bumps are getting painful." *Id.* at 11. His physical exam noted annular plaques, urticarial lesions all over the body, and erythematous tender nodules on forearms. *Id.* at 14. Dr. Ravipati prescribed Cyclosporine. *Id.*

Petitioner reported a rash at his monthly pain check-up with Dr. Goetsch on May 7, 2014. Ex. 5 at 160.  On September 15, 2014, Petitioner was seen by Dr. Hodges because "he th[ought] he [wa]s having an allergic reaction to eggs which he got in chicken salad."  He reported swelling, redness, welts, and itching. Ex. 12 at 5.  Dr. Hodges noted a significant history of allergies and assessed Petitioner with an "allergic reaction to eggs." *Id.*

On October 14, 2014, Petitioner returned to Dr. Hodges complaining of an allergic reaction. The record notes that both upper and lower lips were swollen, red, and itching, and that Petitioner stated "it started after he received a flu shot." *Id.* at 6.  Petitioner informed Dr. Hodges that he would like an opinion from another allergist. *Id.*  Dr. Hodges assessed the Petitioner with an "allergic reaction [of] questionable etiology but presumably due to the egg component in the flu vaccine" and referred Petitioner to an allergist, Dr. Raby. *Id.*

Petitioner saw Dr. Raby at the HH ED on November 3, 2014 complaining of food allergy and angioedema. Ex. 3 at 366.  Dr. Raby ordered several labs, which showed normal liver functioning, normal IgE immunoglobin, normal complete metabolic panel, normal C3 and C4, normal ESR, and normal CBC to include eosinophils. *Id.* at 369-80.  Pork, beef, egg white, and egg yolk radioallergosorbent ("RAST") tests were negative, along with galactose-alpha-1, 3 galactose IgE, and IgE receptor antibody. *Id.* at 381-83.

Petitioner's medical records between December 2014 and September 2015 indicate that he was asymptomatic for rash.  However, an ED visit on April 22, 2015 for "stroke like symptoms" noted "rash all over body ever since he had flu shot last year [and] no one has been able to decide what this rash is from." Ex. 3 at 387, 394.

On September 9, 2015, Petitioner was seen by Dr. Hodges for "breaking out in a rash" after eating a brownie. Ex. 12 at 9.  Dr. Hodges recorded an "allergic reaction with allergic dermatitis presumably secondary to the eggs in the brownie," and prescribed Solu-Medrol, Kenalog, a Medrol Dosepak, and Benadryl. *Id.*

On October 12, 2015, Petitioner returned to Dr. Ravipati's office for breakouts of "red whelps." Ex. 9 at 15.  Petitioner stated that "he ha[d] been told by his family doctor not to get flu shots anymore because the breakouts first began after a flu vaccination in 2013." *Id.*  Petitioner reported that he started having an allergic reaction to eggs, which began after his flu vaccination. *Id.*  Dr. Ravipati noted that Petitioner was a known patient of chronic idiopathic urticaria and egg allergy and further noted that "last year after one-month course of cyclosporine the hives resolved for several months and [Petitioner] didn't keep his follow up appts." *Id.*  He went on to note that Petitioner's episodes had become more frequent since the summer began, requiring frequent steroid shots. *Id.*  The physical exam revealed urticarial lesions on the lower extremities. *Id.* at 15. Dr. Ravipati recommended Atarax and Cyclosporine. *Id.* at 16.

Petitioner followed up with Dr. Ravipati on November 20, 2015 and reported that his hives were getting better. Ex. 9 at 17.  Petitioner's bloodwork and physical exam were normal. *Id.* at 19. Similar results were recorded at a follow-up appointment on December 18, 2015. *Id.* at 21-23.

On December 17, 2015, Petitioner completed FMLA paperwork in which he stated "that his allergy started back with the flu shot on October 20, 2013[6] which has caused his allergic reactions." Ex. 12 at 10.  Petitioner stated that Dr. Ravipati had instructed him to receive no further vaccines.  *Id.*

Petitioner saw Dr. Hodges on January 4, 2016 to follow-up from an ED visit[7] for a laceration to fingers of his left hand. Ex. 12 at 11.  On January 15, 2016, Petitioner saw Dr. Ravipati complaining of rash. Ex. 9 at 25.   Dr. Ravipati noted that Petitioner "was doing well on cyclosporine until a few weeks ago [when] he cut two fingers with a table saw accidentally." *Id.* The physical exam noted "urticaria[l] lesions all over the lower extremities." *Id.* at 27.  Dr. Ravipati noted that Petitioner was possibly "reacting to the presence of infection" and recommended restarting Keflex, increasing Atarax, and continuing cyclosporine.  He also prescribed Depo-Medrol. *Id.* at 28.

Petitioner returned to Dr. Ravipati on February 12, 2016, where it was noted that the hives had resolved. Ex. 9 at 29.  Petitioner's follow-up appointments with Dr. Ravipati on March 11, and April 8, 2016 indicated Petitioner was "pleased with progress," and no skin abnormalities were recorded. *Id.* Ex. 9 at 33-36; 37-40.

## II.     Procedural History

Petitioner filed medical records on October 11, 2016 and submitted additional medical records and his statement of completion on November 28, 2016. ECF Nos. 5, 8, 10.  Respondent filed his Rule 4(c) Report on January 12, 2017, contesting Petitioner's right to damages and suggesting that compensation be denied. ECF No. 13.

On January 17, 2017, Petitioner was directed to file an expert opinion in support of his claims.  After several extensions, Petitioner filed a Motion for a Ruling on the Record, representing that he was unable to procure a medical expert and requesting a ruling on the facts in the record.  I held a status conference on March 7, 2018 and directed Petitioner to file a status report by April 6, 2018, indicating how he wished to proceed. ECF No. 32.  Petitioner's status report was filed on April 5, 2018, notifying the Court of Petitioner's intent to file a Motion for a Dismissal Decision. ECF No. 33.

On May 7, 2018, Petitioner filed his Motion for a Dismissal Decision.  On May 8, 2018, I issued my decision dismissing the case for insufficient proof. ECF No. 36.  Judgment was entered on June 8, 2018. ECF No. 38.

---

[6] This is an error. The flu shot was administered on October 11, 2013.

[7] There are no records from this emergency room visit.

On December 5, 2018, Petitioner filed this present application for a reimbursement of attorneys' fees and costs (ECF No. 41), to which Respondent responded on December 19, 2018. ECF No. 42.   Petitioner submitted his reply on December 26, 2018. ECF No. 43.

The matter of final attorneys' fees and costs in this case is now ripe for a decision.

### III.   Parties' Arguments

Respondent argues that "[P]etitioner has failed to establish a reasonable basis for his claim." Resp't's Resp. at 8.   Citing *Simmons v. Sec'y of Health and Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017), Respondent adds that establishing reasonable basis is dependent on the "evidentiary support for the essential elements of the claim set forth in the petition." *Id*. at 10. Respondent asserts that Petitioner submitted no objective evidence supporting the required elements of his claim. *Id*.   Respondent cited Petitioner's medical records, reiterating that Petitioner's diagnostic testing was negative for egg allergy and Petitioner attended numerous medical visits following vaccination without a single mention of a skin condition such as rash or itching. *Id*.

Second, Respondent states that "a special master may not award compensation 'based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.'" *Id*. at 10 (citing 42 U.S.C. § 300aa-13(a)(1)).   In order for a claim to have a reasonable basis, such claim must, "at a minimum, be supported by medical records or medical opinion." *Id*. at 8 (citing *Everett v. Sec'y of Health & Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Cl. Ct. Spec. Mstr. Feb. 7, 1992)).   Respondent argues that even the recorded statements of Petitioner's physicians are recounted histories provided by Petitioner rather than the findings of the physician.  *Id*. at 10.

Lastly, Respondent argues that counsel is required to conduct investigations of records prior to filing to evaluate the factual basis for the claim.  He suggests that had Petitioner's counsel properly reviewed the factual basis for this claim, he would have realized that objective support for the claims did not exist.  In arguing such, Respondent states that good faith for filing the petition may not have existed.

Petitioner replied to Respondent's Response on December 28, 2018. *See* Pet'r's Reply. Petitioner offered the following arguments in response to Respondent's contentions and in support of a reasonable basis: (1) Petitioner's medical records contain numerous notations of an allergy to flu vaccination; (2) Petitioner's treating allergist treated Petitioner with cyclosporine, an immunosuppressant; (3) Petitioner's counsel thoroughly reviewed the records for reasonable basis prior to filing the petition. *See generally id.*  Additionally, Petitioner asserts that "pre-litigation work performed clearly supports good faith and reasonable basis for filing the petition," and that Petitioner's medical records evidenced such a claim at the time of filing. *Id*. at 10.  Petitioner adds that reasonable basis was maintained while his counsel attempted to acquire a supportive medical opinion; when no supportive expert opinion could be obtained, the petition was promptly dismissed. *Id* at 11-12.

### IV.   Applicable Law

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is mandatory where a Petitioner is awarded compensation; where compensation is denied, as it was in this case, the special master must first determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such requirement is a "subjective standard that focuses upon whether [a] petitioner honestly believed he [or she] had a legitimate claim for compensation." *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as petitioners had an honest belief that their claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Human Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

Regarding the reasonable basis requirement, it is incumbent on petitioners to "affirmatively demonstrate a reasonable basis," which is an objective inquiry. *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 305 (2011); *Di Roma*, 1993 WL 496981, at *1. When determining if a reasonable basis exists, many special masters and U.S. Court of Federal Claims judges employ a totality of the circumstances test.[8] The factors to be considered under this test may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, No. 17-36V, 2018 WL 3032395, at *7 (Fed. Cl. June 4, 2018). This "totality of the circumstances" approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

The Federal Circuit has emphasized that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *See Simmons,* 875 F.3d 632 at 636. In interpreting *Simmons*, some judges have determined that an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa*, 2018 WL 3032395, at *7.

---

[8] Judges on the U.S. Court of Federal Claims have affirmed instances when the special master employed this test or have remanded a decision when the special master did not. *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 288 (2014); *Graham v. Sec'y of Health & Human Servs*., 124 Fed. Cl. 574, 579 (2015); *Rehn v. Sec'y of Health & Human Servs*., 126 Fed. Cl. 86, 91-92 (2016); *Allicock v. Sec'y of Health & Human Servs*., 128 Fed. Cl. 724, 726 (2016); *Cottingham v. Sec'y of Health & Human Servs*., 134 Fed. Cl. 567, 574 (2017).

Unlike the good faith inquiry, reasonable basis requires more than just Petitioners' belief in their claim. *See Turner*, 2007 WL 4410030, at *6. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Human Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015). The evidence presented must be "sufficient to give the petitioner a reasonable expectation of establishing causation." *Bekiaris v. Sec'y of Health & Human Servs.*, No. 14-750V, 2018 WL 4908000, at *6 (Fed. Cl. Spec. Mstr. Sep. 25, 2018). Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity "fails to establish a reasonable basis for a vaccine claim." *Id; see also Chuisano*, 116 Fed. Cl. at 287.

Although "special masters have historically been quite generous in finding reasonable basis for petitions," *Turpin v. Sec'y of Health & Human Servs.*, No. 99-564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005); *see Turner*, 2007 WL 4410030, at *6-7, the court expects counsel for Petitioner to make a pre-filing inquiry into the claim to ensure that it has a reasonable basis. *See Turner*, 2007 WL 4410030, at *6-7.

## V.      Analysis

### A.  Good Faith

Petitioner is entitled to a presumption of good faith. Though Respondent does not directly contest that the petition was filed in good faith, Respondent states that petitioners' attorneys are required to conduct a reasonable evaluation of the medical records to determine if there is a factual basis for the claims asserted in a petition. Regarding this matter, Respondent alluded to the time spent by Petitioner's counsel for reviewing the records prior to filing to suggest that the good faith requirement may not have been met. Respondent clarifies that if I were to find that a review of the records "should have alerted counsel to the glaring problems with the merits of the case," then the petition was not filed in good faith. Resp't's Resp. at 11. Petitioner counters that his counsel's review of the medical records established both good faith and reasonable basis for filing the petition.

I find that there is no indication that a review of the medical records should have alerted Petitioner or his counsel to any glaring issues present in this case. In fact, as discussed further below, I find that a review of the medical records should have reasonably prompted counsel to seek further medical opinion. Therefore, I find that Petitioner exhibited good faith in filing this petition.

### B.  Reasonable Basis for the Claims in the Petition

The reasonable basis standard is objective and requires Petitioner to submit some evidence in support of "the claim for which the petition was brought." § 15(e). The petition in this case alleges that Petitioner received the flu vaccination on October 11, 2013, and thereafter suffered from symptomatic allergy symptoms and an egg allergy. *See generally* Pet. For the reasons stated below, I find that Petitioner had reasonable basis at the time of filing his claim.

8

After my careful study of the record and as discussed in more detail below, I find several claims articulated in the petition are supported by objective evidence. Specifically, the notations of Petitioner's primary care physician, Dr. Hodges, his allergy specialist, Dr. Ravipati, and those made during Petitioner's visits to his gastroenterologist provide some minimal evidence in support of further investigating Petitioner's claims. Therefore, I find that Petitioner met his burden in producing some evidence in support of his claims, thereby establishing reasonable basis for filing his Petition.

1. Medical Record Evidence

Several of Petitioner's treating physicians and specialists have asserted vaccine causation of his injuries and noted such in his medical records. For example, on October 14, 2014, Petitioner presented to Dr. Hodges with swollen upper and lower lips, redness, and itching. Dr. Hodges noted in this record that Petitioner alleges the symptoms started following his 2013 flu shot. Within the same record, Dr. Hodges recorded that his assessment of Petitioner's condition was an "allergic reaction of questionable etiology but presumably due to the egg component of the flu vaccine." Additionally, beginning on October 12, 2015, Petitioner's records with Dr. Ravipati indicate an allergy to the flu vaccine. At that appointment, Dr. Ravipati noted that "[Petitioner] has been told by his family doctor not to get flu shots anymore because the breakouts first began after a flu vaccination in 2013."

These notations, referring to a possible allergy to the flu vaccine, established reasonable basis for Petitioner's claims. Respondent states that these notations in the medical records were associations made by Petitioner and simply recorded by the treater. Conclusions drawn by providers based on Petitioner's statements alone do not always provide objective evidence necessary in support of vaccine causation. However, these notations were not only based on mere associations made by Petitioner but rather represent the conclusions that arose from frequent and continuous treatment of Petitioner's condition. By the October 14, 2014 visit, Dr. Hodges had evaluated Petitioner six times post-vaccination and had observed several instances of intermittent, allergic-type reactions. As his primary care physician, Dr. Hodges initially noted a possible allergic reaction to Xarelto based on Petitioner's statements, removed Xarelto from Petitioner's prescriptions, and referred Petitioner to a specialist. Ex. 12 at 2-3. He did not formulate an opinion regarding the etiology of Petitioner's condition until after ten months of similar appointments. At the October 14, 2014 visit, it seems unlikely that Dr. Hodges would date back Petitioner's present reaction one year to his flu vaccination based on Petitioner's statements alone and without careful consideration of Petitioner's medical history. More likely, Dr. Hodges recorded a determination based on Petitioner's previous instances of allergic reactions that continued to reoccur, despite no longer taking Xarelto, and the temporal correlation he perceived between the vaccination and Petitioner's presentation. Similarly, Dr. Ravipati indicated a possible allergy to the flu vaccination only after Petitioner presented in October 2015 with recurring, allergy-type reactions, for which he sought treatment from Dr. Ravipati initially in March 2014. Dr. Ravipati grounded his conclusions on the observations and recommendations of Dr. Hodges.

To that end, I am also not persuaded by Respondent's argument that the records indicate a medically infeasible onset of symptoms. In fact, there are several notations in the medical records

that indicate a possible onset of Petitioner's symptoms at or near his October 2013 vaccination. Of note, on March 17, 2014, Petitioner presented to Dr. Ravipati for the first time with rash all over his body and a recent incidence of lip swelling.  At that appointment, Dr. Ravipati recorded that Petitioner was "presenting with a 6 month history of breaking out in rashes all over the body." Though Respondent contends that this places onset prior to vaccination, I find it reasonable for Petitioner to approximate six months to date back to October 2013 in this instance.[9]

Also, of note, and consistent with Petitioner's statement that the rashes occurred intermittently, the records from Petitioner's gastroenterology appointments of January 15, 2014, April 2, 2014, and May 8, 2014, indicate the presence of either or both symptoms of skin rash and itching.  Other gastroenterology appointments recorded within that time period do not indicate a presence of any skin abnormality, illustrating Petitioner's claim that the skin rashes were episodic in nature.  Petitioner presented on December 4, 2013, to Dr. Hodges with "painful welts with itching" that "tend to come and go."  At this particular appointment, Dr. Hodges recorded that Petitioner "th[ought] this may be a reaction to Xarelto." Ex. 12 at 2.  Petitioner was taken off Xarelto following this visit, and it was not clear that he was prescribed Xarelto again at any point. As Petitioner's presentation of allergic reactions continued off Xarelto, it is it is reasonable to conclude that Dr. Hodges considered this fact when assessing etiology at the October 14, 2014 visit. This notation, therefore, further supports Petitioner's consistent claims.  It is plausible that onset of his symptoms occurred within a medically feasible period following vaccination but appeared and resolved intermittently.

The combination of Petitioner's medical records, especially those which include causative statements made by two of Petitioner's treating physicians, provide sufficient evidence in support of Petitioner's claims.  Accordingly, I find that Petitioner established reasonable basis for filing his petition.

### 2. Petitioner's Timely Request for a Dismissal of his Petition

On February 10, 2017 Petitioner sought medical review from Dr. Marvin Den.  No information was provided regarding this review and its results.  On May 17, 2017, Petitioner sought further review of his case from Dr. Michael Blumberg.  On May 7, 2018, Petitioner moved to dismiss his petition.  It is reasonable to assume that Petitioner decided to dismiss his petition when he could no longer support his claims with medical opinion.  Thus, I find that Petitioner maintained reasonable basis throughout the prosecution of his petition and that when reasonable basis ceased to exist, Petitioner promptly filed a request for a dismissal decision.

### VI.   Awarding Attorneys' Fees and Costs

---

[9] I note that six months, counted inclusively, would date Petitioner's onset back to October 2013. Furthermore, Petitioner's March 17, 2014 visit was 157 days after his vaccination, 23 days shy of six months.  While generally an onset hearing would assist in similar situations when deciding entitlement, I find that the approximation of six months here meets the standard required for a finding of reasonable basis.

### A. Reasonable Attorneys' Fees

As discussed in detail above, Petitioner has established that there was reasonable basis at the time of filing his Petition. In his Fees App., Petitioner requested a total of $27,208.60 in attorneys' fees.

### 1. Requested Hourly Rates

Petitioner requests compensation for his attorney, Dr. Ramon Rodriguez. Petitioner requests the following hourly rates for work performed by Dr. Rodriguez from 2015 to 2018:

|      | Dr. Rodriguez |
|------|---------------|
| **2015** | $361.00 |
| **2016** | $375.00 |
| **2017** | $383.00 |
| **2018** | $394.00 |

Petitioner also requests that paralegals of RLG, Ms. Lisa Robertson, Ms. Beth Coleman, and Ms. Kristy Smith be compensated for work performed from 2015-2017 at rates varying from $135.00 per hour to $145.00 per hour, based on the year and the individual paralegal. Additionally, Petitioner requests that Ms. Nicole Dernelle, paralegal from SA be compensated for work performed in 2018 at a rate of $149.00 per hour[10]. Fees App. at 5.

### 2. Hourly Rates Awarded

#### i. Dr. Rodriguez

Dr. Rodriguez's requested hourly rates for work performed between 2015-2017 have been previously found by me to be reasonable in *Antisdel v. Sec'y of Health & Human Servs.*, No. 17-964V, 2018 WL 6930459, at *2 (Fed. Cl. Spec. Mstr. Dec. 4, 2018). Additionally, this Court has awarded Dr. Rodriguez his requested rate for 2018 in *Heagney v. Sec'y of Health & Human Servs.*, No. 16-601V, 2019 WL 1375931, at *2 (Fed. Cl. Spec. Mstr. Mar. 7, 2019). Thus, I find Dr. Rodriguez's hourly rates for 2015-2018, as submitted by Petitioner in this present case, to be reasonable and award them as requested.

#### ii. Paralegal Rates

Similarly, all of the rates requested for paralegals are in line with what have previously been awarded to Dr. Rodriguez and his associates, and I find them to be reasonable in this case. *See Heagney v. Sec'y of Health & Human Servs.*, No. 16-601V, 2019 WL 1375931, at *2 (Fed. Cl.

---

[10] The requested rates for paralegals and corresponding years are as follows:
Ms. Lisa Robertson: $135/2015; $140/2016
Ms. Beth Coleman: $135/2015
Ms. Kristy Smith: $140/2016; $145/2017
Ms. Nicole Dernelle: $149/2018

Spec. Mstr. Mar. 7, 2019); *Antisdel v. Sec'y of Health & Human Servs.*, No. 17-964V, 2018 WL 6930459, at \*2 (Fed. Cl. Spec. Mstr. Dec. 4, 2018).  Accordingly, no adjustment to the requested rates is required.

### iii.  Summary of Hourly Rates Awarded

In light of the above, the hourly rates to be awarded in this instant application are as follows:

|  | **Dr. Rodriquez** | **Ms. Lisa Robertson** | **Ms. Beth Coleman** | **Ms. Kristy Smith** | **Ms. Nicole Dernelle** |
|---|---|---|---|---|---|
| **2015** | $361.00 | $135.00 | $135.00 | -- | -- |
| **2016** | $375.00 | $140.00 | -- | $140.00 | -- |
| **2017** | $383.00 | -- | -- | $145.00 | -- |
| **2018** | $394.00 | -- | -- | | $149.00 |

Accordingly, Petitioner's requested hourly rates for Dr. Rodriguez and his paralegals are awarded in full.

### 3.  Reduction of Billable Hours

Based on my review of the billing records submitted with Petitioner's Motion for Reimbursement of Fees and Costs (*see generally* Ex.'s 15, 18), I find that Petitioner's counsel and associated paralegals have billed hours that I consider "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517 at 1521 (Fed. Cir. 1993). For example, the time entries submitted with Petitioner's Fee Motion reflect that the paralegals of RLG billed for performing administrative tasks such as updating internal databases and processing payments.[11]

Additionally, I find that the billing invoices reveal some billing entries reflecting instances of duplicative billing, where attorneys and paralegals billed time for drafting or reviewing the same document.  The billing invoices reflect such duplicate entries where several individuals completed, reviewed, or processed the same notices, documents, or orders.[12]  It has been a long-standing

---

[11] The following billing entries reflect paralegals of RLG billing time for non-compensable administrative tasks such as: (1) updating internal databases (billing entries of LR on 11/12/2015; numerous entries of "Updated medicals records request log" e.g.., 1/29/2016, 3/16/2016, 4/7/2016, etc.)(billing entries of KS on 11/10/2016, 5/30/2017, 6/19/2017); (2) processing payments or drafting correspondence regarding payments (billing entries of RR on 2/12/2016, 4/22/2016, 9/15/2017; KMS on 6/22/2017; 7/31/2017; 8/1-2/2017); *See* Ex.'s 15 and 18.

The billing entries mentioned above are examples and are not exhaustive; they provide a sampling of the many non-compensable administrative tasks billed by paralegals.

[12] See, e.g., billing entries on 5/16/2017 and 7/14/2017. Ex. 15 at 15, 19.

practice in the Vaccine Program to reduce fees for such similar duplicative billing entries. *See, e.g., Z.H. v. Sec'y of Health & Human Servs.*, No. 16-123V, 2018 WL 1835210, at *3 (Fed. Cl. Spec. Mstr. Mar. 6, 2018) (reducing fees where "[m]ultiple attorneys reviewed the same orders and notifications and all billed time for doing so").

Furthermore, I find that the billing invoices for Ms. Robertson and Ms. Smith contain instances of excessive billing for receiving or reviewing filings or records. Ex. 15 at 10-17. I do not find the standard 0.1 hours billed by Ms. Robertson and Ms. Smith to be a reasonable assessment of the time required to conduct many of these tasks, such as receiving, reviewing, and/or processing Court notifications, ECF filings, Notice of Reassignments, etc. *See, e.g., Turkupolis v. Sec'y of Health & Human Servs.*, No. 10-351V, 2015 WL 393343, at *5 (Fed. Cl. Spec. Mstr. Jan. 9, 2015) (reducing fees and noting a pattern of billing 0.10 attorney hours for review of all filings, regardless of the filing's length or complexity). Accordingly, I find Ms. Robertson's and Ms. Smith's hours spent performing these duties to be inflated.

For the reasons outlined above, I will reduce the total award of Petitioner's requested fees. Since I find that the total hours expended by Dr. Rodriguez were generally reasonable, I will reimburse his requested fees in full. I find, however, that the excessive billing by RLG paralegals involved in this matter warrant a fee reduction of 10% of the total requested for paralegal services. This results in a total reduction of Petitioner's Vaccine Act attorneys' fees award by **$875.70**.[13]

Therefore, Petitioner is awarded attorneys' fees in the amount of **$26,332.90**.[14]

### B. Reasonable Attorneys' Costs

Like attorneys' fees, a request for reimbursement of costs must be reasonable. *Perreira v. Sec'y of Health & Human Servs.,* 27 Fed. Cl. 29, 34 (1992). Reasonable costs include the costs of obtaining medical records and expert time incurred while working on a case. *Fester v. Sec' y of Health & Human Servs.*, 10-243V, 2013 WL 5367670, at *16 (Fed. Cl. Spec. Mstr. Aug. 27, 2013). When petitioners fail to carry their burden, such as by not providing appropriate documentation to substantiate a requested cost, special masters have refrained from awarding such costs. *See, e.g., Gardner-Cook v. Sec'y of Health & Human Servs.*, No. 99-480V, 2005 WL 6122520, at *4 (Fed. Cl. Spec. Mstr. June 30, 2005).

Petitioner requests $5,192.49 in attorneys' costs. Fee App. at 5. The requested costs herein

---

[13] RLG Paralegal fees requested = $8,757.00
  Percentage of reduction (10%) = x 0.10
    ***10% reduction amount*** = ***$875.70***
  **Total RLG Paralegal Fees** = **$7,881.30**

[14] Attorneys' fees requested = $27,208.60
  Reduction = ($875.70)
  **Total awarded Vaccine Act attorneys' fees** = **$26,332.90**

can be sorted into two different categories: (1) expert costs and (2) miscellaneous costs, to include costs for filings, obtaining medical records, and mailing.

      1.   Expert costs for Petitioner's experts

### i.  Expert Hourly Rate

Petitioner requests costs for the work performed by two experts, Drs. Den and Blumberg. Petitioner states that he retained Dr. Den through MedQuest[15], which charged a fee of $950.00. Ex. 14 at 12-13.

Dr. Blumberg billed at a rate of $500.00 per hour, for a total of $3,250.00. In examining those billing entries, and taking into account Dr. Blumberg's qualifications, expertise in applicable fields of study, and level of experience in the program, I find Dr. Blumberg's requested rate to be higher than the usual rates awarded to new experts in the Program.  In fact, even experts with significant experience in the Program are not awarded hourly rates higher than $500 per hour. Further, as we have not had the opportunity to evaluate his work through an expert report or testimony at trial, a rate of $500 per hour is high. Thus, I will reduce the hourly rate for Dr. Blumberg to $400 per hour[16].

### ii.  Time Expended by Expert

I remind Dr. Rodriguez that, as articulated by Special Master Moran in *Floyd v. Sec'y of Health & Human Servs.*, a request for expert costs should mirror that of an attorneys' fees, and experts should submit invoices that detail with particularity the amount of time spent on each task. *Floyd v. Sec'y of Health & Human Servs.*, No. 13-556V, 2017 WL 1344623 (Fed. Cl. Spec. Mstr. Mar. 2, 2017).  A failure to do so may result in a reduction of hours awarded.  Petitioner did not submit an invoice showing the itemized time spent by Dr. Den on this matter.  In fact, Petitioner did not submit any documentation from MedQuest other than a credit card authorization form. Ex. 14 at 13. I will pay the $950 cost associated with Dr. Den's consultation in this instance but ask that Dr. Rodriguez submit itemized invoices in the future.  Dr. Blumberg, however, did provide an accounting of his time, and I find the requested 6.5 hours to be reasonable.  Therefore, I will award Dr. Blumberg the full 6.5 hours requested.

Accordingly, I reduce Dr. Blumberg's fees by $650.00[17].  Therefore, I award Petitioner a total of **$3,550.00** in expert costs, reflecting a reduction of $650.00.

---

[15] MedQuest is an organization that finds and arranges the services of medical experts.

[16] Since I was not able to fully evaluate the quality of his work, I am not making a determination of Dr. Blumberg's acceptable fee in the Program.

[17]
| Total Hours Awarded to Dr. Blumberg | = | 6.5 |
|---|---|---|
|   Rate Reduction | = | $100.00 |
| **Total Reduction for Dr. Blumberg** | = | **$650.00** |

2.   Miscellaneous Costs

I have reviewed all other costs incurred by RLG and SA, including costs for obtaining medical records, filing fees, and mailing costs.  I find these expenses, in the amount of **$992.49**, to be reasonable and award them in full.

**VII.   Conclusion**

Based on the foregoing, I hereby **GRANT IN PART** Petitioner's Motion for Attorneys' Fees and Costs, as follows:

|  | Amount Requested | Reduction | Total Awarded |
|---|---|---|---|
| Attorneys' Fees[18] | $27,208.60 | $875.70 | $26,332.90 |
| Litigation Costs[19] | $5,192.49 | $650.00 | $4,542.49 |
| Petitioner's Out-of-Pocket[20] | $6.62 | -- | $6.62 |
|  |  | Grand Total: | $30,882.01 |

Because Petitioner's counsel, Dr. Rodriguez, switched law firms from the Rawls Law Group to Sands Anderson, PC during the pendency of this matter, it is necessary to account for the fees and costs per firm. I therefore award the total of $30,882.01 in fees and costs as follows:

---

[18] RLG Fees Requested = $18,491.30
  RLG Fees Reduced = ($875.70)
  RLG Fees Awarded = **$17,615.60**

  SA Fees Requested = $8,717.30
  SA Fees Reduced = $0.00
  SA Fees Awarded = **$8,717.30**

  Total Fees Requested = $27,208.60
**Total Fees Awarded** = **$26,332.90**

[19] RLG Costs Requested = $5,131.35
  RLG Costs Reduced = ($650.00)
  RLG Costs Awarded = **$4,481.35**

  SA Costs Requested = $61.14
  SA Costs Reduced = $0.00
  SA Costs Awarded = **$61.14**

  Total Costs Requested = $5,192.49
**Total Costs Awarded** = **$3,592.49**

[20]   Petitioner's out-of-pocket expenses awarded in full in the amount of **$6.62**.

1) A lump sum in the form of a check jointly payable to Petitioner and Rawls Law Group, representing attorneys' fees in the amount of $17,615.60, plus costs in the amount of $4,481.35, totaling $22,096.95; and

2) A lump sum in the form of a check jointly payable to Petitioner and Sands Anderson, PC, representing attorneys' fees in the amount of $8,717.30 and costs in the amount of $61.14, totaling $8,778.44; and

3) A lump sum in the form of a check payable to Petitioner, James E. Black, representing his out-of-pocket expenses in the amount of $6.62.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court SHALL ENTER JUDGMENT in accordance with this decision.[21]


**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master

---

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.